The right to use the name Silver Crest as a trade-mark for gin and other alcoholic beverages is the object of the litigation. McKesson Robbins, Incorporated, and Englander, each claiming to own the mark, seeks to restrain the other from using it.
McKesson and its predecessors had been manufacturers of drugs for many years. Its subsidiary corporations were scattered throughout the country, doing a wholesale business. With the approach of repeal of the prohibition amendment, it organized Spirits Import Company to engage in the liquor business, especially around New York, and it had its wholesale houses prepare to deal in liquor. McKesson arranged with a distiller, Hiram Walker Company, for a private brand of gin for which the name Silver Crest was chosen. It was tacitly understood that Walker would furnish this brand to none except the McKesson group. McKesson assumed no liability to Walker except to take up unused bottles, c., at cost, if it should discontinue the brand. Part of the arrangement between them is stated in a letter from Walker to McKesson:
"We mailed you last night a copy of our new price list, from which you will observe that as your purchases will run better than 4,000 cases per month, you will be entitled to an allowance of $1.50 per case on cases containing 3 gallons, and an allowance of $1.20 per case on fifths (2.40 gallons). On bottling done for you under your own private labels, there will be additional discounts of 50c per case and 40c per case respectively for the 3 gallon and 2.40 gallon cases."
The expression "your purchases" in the letter obviously means purchases by McKesson's subsidiaries, since McKesson itself was not making ready to enter the liquor business, and *Page 482 
did not engage in it or deal in Silver Crest gin for several months after the transactions recited below. The subsidiaries bought direct from Walker and paid Walker out of their own funds. The allowances mentioned in the letter were not deducted from the bills sent them; they paid in full, and Walker remitted the amount of the discounts monthly to McKesson. Be it noted that McKesson received a commission — if that is the proper word — not only on sales of private brands, but on all brands.
On the Silver Crest labels was printed "Distilled and bottled for Spirits Import Company," and at the top of the labels were the initials of that company. There was nothing to indicate any connection between McKesson and Silver Crest.
Prohibition repeal became effective December 6th, 1933. On January 27th, 1934, the first shipment of Silver Crest was made by Walker, namely, a carload to Spirits Import Company at New York. The next shipment was two days later by Walker to the McKesson subsidiary in Minneapolis. The first resale occurred February 5th, 1934, and was made by Spirits Import Company. Since then, the business has continued in large volume, widely advertised.
The general rule is that one to acquire a trade-mark must actually use it in his business and the right arises with the first use. Did McKesson acquire the trade-mark Silver Crest on the sale and shipment January 27th, from Walker to Spirits Import Company? McKesson was not a party to the transaction; its position was that of a broker who had procured a customer for Walker. While the owner of a trade-mark need not be the manufacturer of the goods on which the mark is used, it seems he cannot have a trade-mark save in connection with his own trade. To borrow the language of easements, there can be no trade-mark in gross, or except as appurtenant to the business of the owner of the mark.
"The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply *Page 483 
to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business." United Drug Co. v. TheodoreRectanus Co., 248 U.S. 90; 39 S.C. 48. "A trademark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his."Prestonettes, Inc., v. Coty, 264 U.S. 359; 44 S.C. 350. The principle that a trade-mark has no existence apart from the business of its owner, is the basis of the decisions that a trade-mark cannot be assigned separate from the business. Falk
v. American West Indies Trading Co., 180 N.Y. 445;73 N.E. Rep. 239; 1 L.R.A. (N.S.) 704, and cases cited in note.
Vice-Chancellor Van Fleet said in Schneider v. Williams,44 N.J. Eq. 391: "The principle that no person can acquire a right to a trade-mark except he put merchandise or a vendible commodity on the market, marked or distinguished by his particular mark, has been repeatedly affirmed by judges of the very highest distinction. * * * The bill does not show that the complainants have applied their mark or label to a vendible commodity of which they are the owners or in which they trade and that they have put such commodity marked with their mark on the market. Such application and user constitute, according to the established law on this subject, the only foundation on which a title can rest; without them, it is impossible to acquire a title."
In Schmalz v. Wooley, 57 N.J. Eq. 303, the court of errors and appeals suggested that it is the actual marketing of the article which should be stressed, and not the person by whom it is marketed. The case related to a union label on hats. Mr. Justice Dixon wrote that the workman's "aptitude in his trade is his property and if, by a mark, he can have it identified as his in the market, he may enhance its salable value and thus secure the same sort of advantage as his employer by similar means. No reason exists why this advantage should not be protected by the courts in the same manner and to the same extent as is the like advantage of the *Page 484 
employer." This case notes an exception to the principles of trade-mark law.
It may be — though I have found no authority so holding — that a similar exception would be made in the case of a merchandise broker who might cause the manufacturer to place the broker's mark on goods sold to the broker's clientele. But as already stated, the Silver Crest labels did not bear McKesson's name; they were marked Spirits Import Company. McKesson, in the early part of 1934, did not deal in alcoholic beverages, and had no good will in business of that nature to protect. It acquired no trade-mark on the sale from Walker to Spirits Import Company.
Walker later assigned its right in the name Silver Crest to McKesson but it did not transfer to McKesson its good will, its distillery, or anything else. The assignment vested no right in McKesson. Falk v. American West Indies Trading Co., supra;Chadwick v. Covell, 151 Mass. 190; 23 N.E. Rep. 1068; PresidentSuspender Co. v. Macwilliam, 238 Fed. Rep. 139. Spirits Import Company cannot date title to the mark from the sale or shipment to it of the car load of gin on January 27th. The trader's right to a trade-mark does not arise when the goods marked with the mark are manufactured for him or when he buys them, but when he puts them on the market. Walter Baker Co. v. Delapenha,160 Fed. Rep. 746. What I have said concerning the sale by Walker to Spirits Import Company applies equally to the sale by Walker to the McKesson-Minneapolis Company, January 29th, 1934. McKesson cannot found its claim on either of these sales.
On February 5th, Spirits Import Company sold and delivered to a third party gin bearing its name and marked Silver Crest. Undoubtedly, unless Englander had prior title, the Spirits Import Company then acquired a right to the trademark. That company was dissolved the following autumn and all its assets, including the trade-mark Silver Crest, passed as a liquidating dividend to McKesson.
A number of the witnesses presented by Englander to prove his use of the name Silver Crest, were entirely unreliable. *Page 485 
Disregarding them, the proof is still overwhelming that on January 27th, 1934, and following days, Englander sold port and sherry wine, creme de menthe and other cordials, labeled Silver Crest and bearing the name Federal Products Company, under which Englander traded. On February 16th, 1934, he filed with the secretary of the State of New Jersey the trade-mark Silver Crest which he certified would be applied to wines, cordials, rum punch and whiskey. June 8th, 1935, he again filed the mark to be applied to gin, wine and all other alcoholic liquors. Actually, he sold no Silver Crest gin until long after the McKesson gin of the same name had become well established in the trade.
There is another feature of the case on which McKesson's counsel lays much stress. In the fall of 1933, Walker inserted in a liquor trade paper of wide circulation, an announcement that it intended to use the name Silver Crest on distilled liquors. It was published in a column headed "Public notice is hereby given that the following applicants proposed to register the trade-marks listed. Objection on ground of conflict or priority should be entered at once with Mida's Trade Mark and Patent Bureau." There was no direct proof that this advertisement came to the attention of Englander but there were circumstances which lead me to believe that it did, although I do not find it necessary definitely so to determine. Assume that Englander learned that Walker intended to market distilled liquor branded Silver Crest; that he liked the name and decided to use it himself. "Mere adoption of a mark or sign and a public declaration by advertisement or otherwise that a person will, at a subsequent time, put a particular thing on the market, marked or distinguished in a certain way, create no right. Until the thing is actually on the market, marked by the particular mark of the person intending to acquire a title, no property right in the mark arises." Schneider v. Williams, supra. When Englander put his Silver Crest products on sale, McKesson had no right in the name. True, Englander did not invent the mark. "Undoubtedly words or devices may be adopted as trade-marks which are not original inventions of him who adopted *Page 486 
them." Delaware and Hudson Canal Co. v. Clark, 80 U.S. 311;20 L.Ed. 581. "It is the use and not the invention of a trade-mark that creates the exclusive right." M.B. Fahey Tobacco Co. v.Senior, 247 Fed. Rep. 809, 814; 252 Fed. Rep. 579. The course pursued by Englander is not one to be commended, but yet he had a legal right to do what he did and he thereby got a valid trade-mark for wines and cordials.
There remains the question whether Englander's title precluded McKesson from gaining the right to use the same name Silver Crest as applied to gin. Different persons can acquire the same trade-mark for articles of different kind. American SteelFoundries v. Robertson, 269 U.S. 372; 46 S.C. 160. But it is generally held that the difference must be so radical that deception of the buying public is unlikely. Aunt Jemima MillsCo. v. Rigney Co., 247 Fed. Rep. 407; L.R.A. 1918C 1039 andnote. In the usual case, first one party creates a wide demand for its trade-marked products then the second party adopts the mark for a related product with intent to profit by the reputation and advertising of the original. Under such circumstances even though the products are not competitive, injunctions are granted. Where good faith of defendant appears, an injunction more rarely issues or is narrower. Whiting-AdamsCo. v. Adams-White Brush Co., 260 Mass. 137;156 N.E. Rep. 880. Or when the same term — for instance, Blue Ribbon — is used by several producers in connection with many diverse articles, so that it does not signify to the public any single firm, then the right of any one who adoptes that term is very limited. PabstBrewing Co. v. Decatur Brewing Co., 284 Fed. Rep. 110. InEureka Fire Hose Co. v. Eureka Rubber Manufacturing Co.,69 N.J. Eq. 159; affirmed, 71 N.J. Eq. 300; Same Case, 72 N.J. Eq. 555,
Vice-Chancellor Emory held, regardless of fraudulent intent, defendant should be restrained from using the same mark as complainant on competitive goods, and further, because of fraud, it should also be enjoined from using the word at all so long as it sold any goods in competition with complainant. *Page 487 
McKesson's good faith is unchallenged. When its subsidiary began to market Silver Crest gin, that name was associated with Englander by very few people. He profits, rather than suffers from McKesson's advertising and good will. Under the circumstances of the cause, Englander's title should be confined to narrow limits.
Does gin compete with wines and cordials? In a sense, all beverages compete with each other. Before dinner, one may choose tomato juice or sherry or a gin cocktail. On another occasion, he may elect ginger ale, a gin rickey or a rye highball. I think there is no substantial competition between gin on the one hand and port, sherry and cordials on the other.
The result is that Englander's bill will be dismissed, and that, on McKesson's bill, Englander will be enjoined from using the name on gin but the restraint will be no broader.